IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ULYSSES PAUL CUEN, | ) | No. C 05-4569 JSW (PR) |
| Petitioner, | ) | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| vs. | ) | |
| M.S. EVANS, Warden, | ) | |
| Respondent. | ) | |

## INTRODUCTION

Petitioner, a prisoner of the State of California who is incarcerated at Salinas Valley State Prison, in Soledad, California, has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. This Court ordered Respondent to show cause why a writ should not issue. Respondent filed an answer, memorandum and exhibits in support thereof and Petitioner filed a traverse. For the reasons stated below, the petition is denied on the merits.

## PROCEDURAL BACKGROUND

On July 19, 2002, a jury convicted Petitioner of arson and the lesser-included offense of misdemeanor assault in Santa Clara County Superior Court. On October 25, 2002, the trial court sentenced Petitioner to a term of thirty-four years to life in state prison. Petitioner appealed to the California Court of Appeal, which affirmed Petitioner's conviction on August 26, 2004, and to the Supreme Court of California, which denied Petitioner's petition for review on November 10, 2004. Petitioner filed the instant petition on November 8, 2005.

# FACTUAL BACKGROUND

The facts underlying the charged offenses, as found by the California Court of Appeal, are summarized as follows:

Appellant was charged with an assault with a deadly weapon on his sister, Deeana Valdez, committed April 2, 2001, and willful arson of an inhabited structure, committed the next day, April 3. Deeana testified she lived in a trailer behind her parents' house in San Jose. On the evening of April 2, she was in the kitchen of the Valdez home with her nephew preparing dinner. Appellant came in appearing mad, and told her to "get the fuck out" of the house. When she told him she was not going to leave, he "got madder." He had a "dog choker chain with a heavy brass key chain at the end" in his left hand. Deeana had been facing the stove, and she turned toward appellant. Appellant extended his arm away from his body, with the hand holding the chain level with his head, and his hand "was moving back almost like a tennis racquet." Deeana closed her eyes and "ducked." When she opened her eyes, her nephew had appellant in a headlock. They were wrestling and hit the stove. Someone in the household called the police and the nephew "threw [appellant] out the front door." Deeana told the responding officer "she didn't [know] how close [the chain] was because she turned her head and turned away from it to avoid being struck." The officer told Deeana she could call 911 and hang up if she had a problem with appellant again but could not talk on the telephone.

The following evening, Deeana was in the kitchen when appellant walked through the front door and placed a propane canister in the hallway within a few feet of the wall furnace. Appellant began opening the valve on the propane canister, and Deeana picked up the telephone to call the police. Deeana could smell propane. She told appellant "that all anybody was trying to do was help him and then he needed to get help." Appellant told her he wanted to be left alone and to "get the fuck out of the house."

Placido Cuen, appellant's and Deeanas's frail, elderly father, came out of a bedroom where he had been taking a nap. He tried to turn the valve off. Placido told appellant to "get his ass out" of the house. Placido testified appellant "just smiled at me.... All he said was he was going to take the house with him." Placido told appellant "your mother's still inside." Appellant smiled at him and said, "Well, I'll take her too." Appellant took the canister into a bedroom and closed the door. Placido woke up appellant's mother and the two went outside the house and called the police, who arrived about 15 minutes later.

The arriving deputies heard crying and moaning coming from appellant in the area of a window near the southwest corner of the house. They heard a loud gas hissing noise and immediately headed back toward the driveway. From her trailer, Deeana heard appellant calling her name in the backyard. She walked out of the trailer and there was an explosion. Appellant was in the backyard jumping up and down, pulling his hair and yelling, " I didn't do it. I didn't do it." Deeana ran inside the burning house to find her parents. Through a window, she caught a glimpse of her father outside on the street and left the house.

2

Angelina Cota testified she was at a barbeque in the backyard of a home two or three blocks from the Cuen home when appellant, whom she had not met before, came walking into the front yard in a fast, panicky way. Appellant was mumbling and was shaky and sweaty. Appellant told Cota and her uncle that he "blew up [his] mom and dad." He said he opened cans of propane and turned on the heater and blew up his parents' house. Cota and her uncle took appellant to a psychiatric ward.

An arson investigator determined that the explosion at the Cuen home had been caused by propane gas ignited by a heater.

*People v. Cuen*, No. H025224, 2004 WL 1903389, at *1-2 (Cal. Ct. App. Aug. 26, 2004) (footnotes omitted) (Resp. Ex. F)..

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor,* 529 U.S. 362, 413 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case.  *Id.*  As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1)

correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) (citing *Williams*, 529 U.S. at 405-07), *overruled in part on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether the state court's decision is contrary to, or an unreasonable application of clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision.  *LaJoie v. Thompson,* 217 F.3d 663, 669 n.7 (9th Cir. 2000).  If the state court only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law.  *See Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001).

## DISCUSSION

### I.      Motion to Substitute Counsel

Petitioner raised five unsuccessful *Marsden* motions to discharge his appointed counsel on October 23, 2001 (CT 28), November 5, 2001 (CT 31), February 13, 2002 (CT 43), July 3, 2002 (CT 74-75), and July 16, 2002 (CT 98).  Petitioner contends that the trial court violated his constitutional right to counsel in denying his last two *Marsden* motions on July 3, 2002, and

July 16, 2002.  The Court of Appeal summarized the relevant facts as follows:

July 3 Motion

On July 3, 2002, the Honorable Rise Pichon invited appellant to speak to the court regarding his dissatisfaction with appointed counsel. During the course of the hearing, appellant complained that his counsel only knew what was contained in the police report and did not know appellant's "side of the story." He accused counsel of being "in concert with the D.A." and asserted defense counsel was "not [his] type of guy." He told the trial court that she had heard a previous Marsden motion brought by him against one of his former appointed attorneys, but the court said she only "vaguely remember[ed]" it. Appellant complained that there had been no investigation done for his case. He complained that counsel had fallen asleep on him, although he later said he did not mean that complaint literally. He complained that counsel called him a "fucking little bitch."

Defense counsel told the court he was not working for the prosecution and that he used the police reports for information because the preliminary examination had been waived. He said defense investigators had contacted family members and witnesses. As counsel responded, the court asked appellant, "why are you making that noise while he's talking?" and sorted out the basis of appellant's objection to counsel interviewing certain family members. Defense counsel told the court he was surprised by appellant's motion and he had spent "fairly lengthy amounts of time" speaking to appellant in the jail.

During the hearing, the court took a recess for appellant and counsel to talk to each other. Appellant said, "I don't have nothing to say to him." The court told appellant that when the recess was over, she would "come back out and if you're still not happy, you can tell me that. [] If you feel that you were called a bad name, you can ask [defense counsel] about that. [] If you are not satisfied, then I'll ask him about that."

After the recess, appellant told the court that he "really would like another lawyer, please." When the court pointed out that he had already had three lawyers, appellant responded, "Yes, and every time I try to fire them, they end up dumping me." The court asked appellant "what else" he wanted defense counsel to do and appellant said, "There's not much he can do for me when somebody called you a fucking bitch, excuse my language, but there's no-there's no-that's no communication between lawyer and client."

The trial court asked defense counsel if that had happened, and counsel responded, "Somewhat in that vein it did, your Honor. What happened was when I went to see him ... Mr. Cuen came in and was upset about the way the [prosecutor's motion for continuance of the trial date] went, accusing me of conspiring with the D.A. As I was leaving, he was speaking with the C.O. there, he was basically complaining about me and basically cursing about my performance and using, for lack of a better word, some pretty flowery language, which I'm not going to represent. [] What I basically said to him through the gate, I said, look, if you have a problem with me, you tell me. You act like a man, you come to my face you tell me what your problems are. I said, don't act like a snitch.

5

I told him to not act like a snitch. [] That's when the elevator closed, but that's exactly what I said. That's what I said. I stand by what I said. [] I'm the type of person, if you have a problem with me, you tell me. Behind my back doesn't help me. Telling the C.O., whoever was there on duty that day, however you want to put it, that there's a problem doesn't help me any way to address any problems that the gentleman may have. [] That's how it went down. Yeah, I spoke out of anger because I was upset." Counsel assured the court, "people can say things in anger and during the course of arguments, and that's not going to affect my ability to represent him .... if I had to take it back, I would have handled it differently." The trial court denied the motion.

. . .

July 16 Motion

On July 15, 2002, with appellant present, the Honorable Richard Loftus addressed numerous in limine motions that defense counsel had filed. On the morning of July 16, jury selection commenced and the trial court began screening the potential jurors for hardship excuses. Later that morning the trial court took a recess to hear appellant's Marsden motion. The court asked appellant why he felt defense counsel was not properly representing him. Appellant said, "I asked him to check for people that, that, for instance, some of witnesses that were testifying against me. And he hasn't done it. He came to talk to me one day and he called me a bitch. And I think that's very unprofessional. And this was, you know, this is a life case right here. This is my whole life, and I think he should fully back me up a hundred percent. And that's what I need.... [] ... You know, he tries to put words in my mouth that I never said and I just, you know, I'd like to have somebody else.... If you want I got a witness about the saying, him calling me a bitch." Appellant gave the witness's name and badge number.

The trial court asked appellant what he thought defense counsel had not done that he should have, and appellant said " I think he should have went into the, to find out about the other people that were liable." He mentioned his son and his uncle, and said defense counsel "needs to get a character witness ... 'cause my family is nothing but drunks.' " Appellant complained that defense counsel had not called his mother who was "right there when all this happened."

The trial court asked defense counsel to respond. Defense counsel told the court he had 13 years of experience as a criminal defense attorney, that he had had appellant's case for almost two months, and that he had discussed the case with appellant seven or eight times. He mentioned that once appellant refused to talk to him. Counsel explained that some of the witnesses had been interviewed when appellant was represented by appellant's first appointed counsel, and, when new counsel was appointed, some of these witnesses were re-interviewed. Counsel said, "So, there have been some witnesses interviewed several times." Counsel said that appellant's son and uncle were not going to be called as witnesses by the prosecution and it was "to Mr. Cuen's benefit they're not coming to testify." Counsel said appellant's mother had been interviewed twice. The court asked appellant if he had anything more for the court to consider. Appellant answered, "Those people, I think it's critical for the, for the jury to hear because this case [is]

being, by-basically, what's going on right now is, you know, what my parents, my mom and dad set me up to get, get busted. And everything went too far. And something stupid happened. And in order to come out, for these lies to come out, I feel that these people need to be called." The trial court denied appellant's motion.

(Resp. Ex. F at 6-10.)

## A.  Legal Standard

Federal law provides that a criminal defendant who cannot afford to retain counsel has no right to counsel of his own choosing. *See Wheat v. United States*, 486 U.S. 153, 159 (1988). The Sixth Amendment guarantees effective assistance of counsel, "not a meaningful relationship" between an accused and his counsel. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983). Nor is he entitled to an attorney who likes and feels comfortable with him. *United States v. Schaff*, 948 F.2d 501, 505 (9th Cir. 1991). However, to compel a criminal defendant to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive the defendant of counsel. *See United States v. Moore*, 159 F.3d 1154, 1159-60 (9th Cir. 1998) .

In conducting a federal habeas review based on a denial of a motion to substitute counsel, the principle inquiry is whether the denial of Petitioner's motion violated his Sixth Amendment right to counsel. *See Schell v. Witek,* 218 F.3d 1017, 1024-25 (9th Cir. 2000). More specifically, the habeas court must ask whether the trial court's denial "actually violated [Petitioner's] constitutional rights in that the conflict between [Petitioner] and his counsel became so great that it resulted in a total lack of communication or other significant impediment that resulted in an attorney-client relationship which fell short of what is required by the Sixth Amendment." *Id.* at 1026.

## B.  Analysis

Petitioner claims that the trial court should have granted his July 3rd and July 16th *Marsden* motions based on the heated exchange between him and counsel, and counsel's failure

to investigate his son and uncle or call his mother as a witness.  The California Court of Appeal found that the trial court did not abuse its discretion in denying the motions.  In so ruling, the Court of Appeal applied the same standard as the federal standard set forth above for determining whether petitioner's right to counsel was violated.  Specifically, the Court of Appeal stated that petitioner would be entitled to relief if appointed counsel "is not providing adequate representation" or petitioner and counsel had "become embroiled in an irreconcilable conflict."  (Resp. Ex. F at 4-5.)  As the Court of Appeal applied the same standard as the appropriate federal standard, its decision was not "contrary to" clearly established federal law under § 2254(d)(1).  *See Williams v. Taylor,* 529 U.S. 362, 413 (2000).

The California Court of Appeal also reasonably applied federal law in denying petitioner's claim.  The Court of Appeal upheld the denial of petitioner's July 3 *Marsden* motion based on the following reasoning:

> Appellant contends the trial court erred in denying his motion to substitute appointed counsel. Appellant argues, "calling him either a 'bitch' or a 'snitch' with the use of the obscenity would likely cause appellant to feel there was an irreconcilable conflict with an attorney who has represented him for only one month on a case that could result in life imprisonment." Appellant asserts the trial court should have followed up with specific targeted questions to clarify "whether [defense counsel] was actually denying that he called appellant a 'fucking little bitch' and whether he claimed he did not use the word 'fucking' even if he said 'snitch' rather than 'bitch.' " He argues this information was important in assessing the degree of the breakdown of the relationship.

> The trial court conducted sufficient inquiry and the denial of appellant's motion to substitute appointed counsel was within its discretion. Counsel explained the regrettable circumstances under which he engaged in name-calling and assured the court he could continue to represent appellant effectively. Although his conduct was unprofessional, counsel's admitted flash of anger, placed in context, occurred under circumstances that were particularly provocative. Counsel had taken the time to visit appellant in jail and discuss the case with him. Any criminal defense attorney, especially one who is appointed by the court, knows that his or her reputation within the jail can make or break his or her relationships with other clients. Appellant's complaints to the correctional officer, "cursing about [defense counsel's] performance" using "pretty flowery language" in the proximity of the jail gate and the jail elevator, could trigger a storm of unwarranted suspicion of counsel by other inmates that could take months to quell. Responding to cursing with cursing, while inappropriate, was a strong demand that appellant make his complaints about counsel in an appropriate

8

> forum. This isolated name-calling incident, in response to appellant's insulting conduct, does not demonstrate or suggest an irreconcilable conflict.
>
> The trial court is not required, in conducting sufficient inquiry to comport with the requirements of Marsden, to act as a therapist. Defense counsel and appellant do not have to like each other in order for counsel to provide effective representation. Personality conflicts will be present in many situations in which counsel can nonetheless provide vigorous and effective representation. The trial court could, upon hearing counsel's assurance that, despite this incident, he felt he could still "work with" appellant, accept counsel's representation. The trial court did not abuse its discretion in denying appellant's motion.

(Resp. Ex. F. at 8-9.)   The Court of Appeal went on to uphold the denial of the July 16 *Marsden* motion based on the following reasoning:

> Appellant contends the trial court erred in denying the motion.  He argues "Judge Loftus not only completely failed to inquire about the extent of the breakdown of the relationship, he also failed to determine whether an irreconcilable conflict made ineffective representation likely."  He suggests the trial court should have brought C[.]R[.], the witness named by appellant, to testify regarding the statement made by [defense counsel]" and "should have reviewed material from the Penal Code section 1368 proceedings to determine if it would be helpful in evaluating the conflict and its effect on [defense counsel's] representation."
>
> Nothing in the record suggests that the trial court did not believe that defense counsel called appellant a name or disagreed with appellant's view that the use of the word was "very unprofessional."  However, the trial court could conclude that this single incident during which defense counsel "came to talk to [appellant] one day" and called appellant a "bitch," although regrettable, was not an allegation "serious enough to evidence a complete breakdown in the attorney client relationship."
>
> Because a different attorney represented appellant during the competency proceedings, the materials from those hearings would be of only marginal relevance to assessing any conflict between appellant and his current defense counsel.  No further inquiry was necessary into the name-calling incident, the Penal Code section 1368 proceedings, or any of appellant's other complaints was required.  Furthermore, although the trial court did not rule that appellant's *Marsden* motion was untimely, the court could be justifiably skeptical about appellant's timing in bring this motion while 70 prospective jurors awaited selection.  The court did not need transcripts of appellant's previous *Marsden* hearings to know, from the minute orders in the court file, that previous motions had been brought and denied.  The trial court did not abuse its discretion in denying appellant's motion because appellant failed to demonstrate either inadequate representation or irreconcilable conflict.

Resp. Ex. F at 10-11.

The Court of Appeal reasonably found that counsel's heated remarks to Petitioner on one occasion did not create a conflict "so great" as to amount to a complete breakdown in representation and a denial of counsel.  Counsel explained that his remarks came during a heated exchange after Petitioner had used profane language in complaining about counsel's performance to a correctional officer at the jail.  (Reporter's Transcript ("RT") 143, July 3, 2002; RT 157-56, July 16, 2002.)  In addition, counsel expressed remorse by stating that, in retrospect, he would have handled the situation differently.  Most importantly, counsel averred that the incident would not affect his ability to fully represent Petitioner.  There is no evidence in the record that counsel's performance deteriorated, or was in any way impaired by this exchange, nor is there any evidence of "a total lack of communication" or "other significant impediment" that resulted in constitutionally ineffective assistance of counsel.  *See Schell*, 218 F.3d at 1026.  Counsel indicated that prior to the July 3rd hearing, he had seen Petitioner more than once and had spent lengthy amounts of time speaking with Petitioner without experiencing or sensing any problems with their relationship.  RT 139.  In fact, counsel also told  the trial court in the July 16th *Marsden* hearing that within the past two months he had discussed the case with Petitioner seven or eight times and only once did Petitioner refuse to speak with counsel.  RT 162, July 16, 2002.  In light of such evidence, it is clear that counsel and Petitioner were still able to communicate regarding Petitioner's defense despite the negative verbal remarks by counsel on one occasion.

Furthermore, Petitioner has not cited any federal law binding on this Court that holds that one negative incident of conflict between counsel and defendant creates an irreconcilable conflict amounting to the denial of the right of counsel.  The denial of a motion to substitute counsel is generally found to be erroneous when counsel completely fails to communicate or develop a relationship with the defendant.  *See United States v. Nguyen*, 262 F. 3d 998, 1003-04 (9th Cir. 2000) (quoting *Brown v. Craven,* 424 F.2d 1166, 1169 (9th Cir. 1970) (a defendant is

denied his Sixth Amendment right to counsel when he is forced into a trial with the assistance of a particular lawyer with whom he is dissatisfied, with whom he will not cooperate, and with whom he will not, in any manner whatsoever, communicate); *Crandell v. Bunnell*, 144 F.3d 1213, 1215-18 (9th Cir. 1998) (denial of substitute of counsel violated 6th Amendment where appointed counsel failed for months to investigate the case and to develop relationship with defendant).

The Court of Appeal also reasonably found that Petitioner's complaints about counsel's alleged failure to investigate Petitioner's uncle and son, and to call his mother, did not warrant substitution of counsel.  Counsel explained that he had in fact anticipated that the prosecution would call Petitioner's uncle and son because both were on the original witness list, and that he had accordingly taken initial steps to investigate them.  RT 164, July 16, 2002.  However, neither the uncle nor the son were on the prosecution's updated witness list, dated June 15, 2002, and therefore counsel did not investigate them further.  RT 164-65.  Counsel further stated that he believed Petitioner benefitted from the fact that these witnesses did not testify.  RT 165.  There was no reason for counsel to investigate Petitioner's uncle and son when the prosecution did not provide them as witnesses against Petitioner.  With respect to Petitioner's mother, she explained that she was not a witness to the events, and was apparently taking a nap when someone told her to leave the house.  RT 165.  In sum, Petitioner's complaints about counsel's decision not to bring Petitioner's mother, son and uncle to the stand amount to disagreements over tactical decisions, and do not establish a complete breakdown of communication that deprived Petitioner of effective representation.  *See Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) (holding that disagreements over strategical or tactical decisions do not rise to the level of a complete breakdown in communication).

The record indicates that the evidence raised by Petitioner in his July 3rd and July 16th *Marsden* motions did not establish that there existed a conflict with counsel that was "so great"

that the attorney-client relationship completely broke down.  Therefore, the state courts'

rejection of Petitioner's substitution of counsel claims was not contrary to, or an unreasonable

application of, clearly established federal law.  Accordingly, habeas relief is not warranted on

this claim.

## II.    Competency

Petitioner claims that the trial court violated his right to due process when it found

Petitioner to be competent to stand trial based on a definition of mental disorder that did not

comport with the requirements of due process, and that such decision was not supported by

substantial evidence.  The Court of Appeal summarized the relevant facts as follows:

> After a *Marsden* hearing on February 13, 2002, the trial court denied the motion and a doubt as to appellant's competence was declared. The court suspended criminal proceedings and appointed two doctors, Dr. Douglas Harper and Dr. David Echeandia, to examine appellant. At appellant's court trial on the competency issue, the court received the doctors' written reports into evidence, Dr. Harper testified as a prosecution witness, and Dr. Echeandia testified for the defense. Both doctors agreed, and defense counsel conceded, that appellant understood the nature of the criminal proceedings. The issue was whether appellant, as a result of mental disorder, was unable to assist counsel in the conduct of a defense in a rational manner.

> Dr. Harper testified he had been a psychiatrist since 1968 and estimated he had conducted "probably between 1,500 and 2,000" competency evaluations. He examined appellant for about an hour. Appellant told Dr. Harper that his family was cooperating with the authorities to have him "put away," as they had "tried" to do in 1998. Appellant told Dr. Harper "he had had disagreements with counsel in terms of how he feels his defense should be handled and how counsel ... feels the defense should be handled, and in terms of playing into the system rather [than] being for him and his defense." Dr. Harper testified appellant "could very well have paranoid ideas and feelings," but "concluded that he did not have a mental disorder and as required under [Penal Code section] 1369 you have to have a mental disorder to be considered under that."

> Dr. Harper took into account appellant's "belief system" that his family was victimizing him in 1998 and that appellant "compared that particular situation with the current one and felt that his defense needed to take into account the whole history of his relationship with his family and how they had essentially treated him throughout his life." In his report, Dr. Harper wrote "I would doubt that whether he would ever be in a position to adjust his belief system and move in the direction of a defense based on the facts as communicated to him by counsel." Defense counsel asked, "Is it fair to say that you concluded that he could not and would not probably be able to assist counsel in a rational manner?" Dr.

Harper answered, "There is a difference between could not and would not. My conclusion is in my judgment he would not. But that is not based on the mental disorder because I feel he could if he chose to." He testified that appellant was "[p]robably not going to change."

Dr. Harper explained, "a diagnosis of schizophrenia or delusional disorder, major depression or bipolar disorder, those kinds of things are considered mental disorder." He said paranoid psychosis was a mental disorder, but that "[p]aranoid personality is not a mental disorder."He said, "I could testify that he could be very ill, be paranoid. In my judgment, he is not paranoid." He said, "Mental disorder does not apply to characterological disorder." He acknowledged that "there may be some significant controversy with regard to the issue of whether or not [appellant] was competent," but that he wanted "to make it very clear that in my judgment it is characterological." He testified, "There is no question in my mind that Mr. Cuen is not suffering from a mental disorder. There is no question in my mind that he is diagnosed with a characterological disorder." Dr. Harper did conclude that appellant had "an impediment with regard to his capacity to assist his counsel in the conduct of his defense in a rational manner ... because of ... the way he views reality."

Dr. Echeandia testified he was a clinical psychologist who had performed "a couple of hundred" evaluations. He examined appellant "an hour and fifteen minutes, an hour and a half." He found the "most prominent" feature of his thought process was "what appeared to be a persecutory belief system you call paranoid someone that deals with these people are persecuting him, particularly around his family." He testified, "given the general constellation of things that I observed, I consider it to fall in paranoid delusional disorder." He concluded that appellant could not assist counsel "[b]ecause he believes his conspiracy theory and he seems to be requiring his attorney to believe it as well and to proceed with the case based on that theory and to present evidence or try the case in a manner based on that theory. And since if the attorney doesn't agree with that theory, then he believes the attorney is either conspiring against him or at the very least not capable of conducting the case the way that he needs to have it done ."

When asked what he meant by saying appellant was not cooperating with his attorney in conducting a rational defense, Dr. Echeandia said he understood the term "rational defense" "to mean that the person is able to cooperate with an attorney using an approach that takes the evidence into account, that addresses the evidence that is there, that using a standard form of, you know, checking information from witnesses, and going through a court proceeding in which the evidence, as it is, can be examined as a realistic perception or assessment of the weight of the evidence against him and how to proceed in defending against that evidence."

Dr. Echeandia observed that appellant was not "reluctant to provide information" to counsel, but that appellant thought that he would not be believed. Appellant's "problems with his attorney" were that "she wants him to accept a trial by the judge and he thinks he has a better chance with a jury"; that "she doesn't believe his version of events"; and that "she doesn't want to fight for him in the manner that he prefers." Dr. Echeandia conceded that none of these problems was

13

necessarily a sign of a mental disorder.

Dr. Echeandia testified he thought his determination that appellant was incompetent "was kind of a close call.... There is certain characterological elements of disorders that he has.... So there are elements of his character and his personality that could contribute to his-to his behavior."He agreed that appellant met many of the criteria of Dr. Harper's diagnosis of paranoid personality disorder, and that there was "overlap," but that appellant was "beyond those symptoms with respect to the quality and nature of the delusions."

On May 3, 2002, the trial court found appellant competent to stand trial.

(Resp. Ex. F at 11-14.)

### A.    Legal Standard

A criminal defendant may not be tried unless he is competent and he may not waive his right to counsel or plead guilty unless he does so competently and intelligently. *See Godinez v. Moran*, 509 U.S. 389, 396 (1993).  The conviction of a defendant while legally incompetent violates due process. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 510 (9th Cir. 1994).  The test for competence to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- whether he has a rational as well as factual understanding of the proceedings against him." *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985).  A claim that a defendant was actually incompetent to stand trial is a "substantive incompetence claim." *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004).  In finding facts and determining credibility, a trial court is free to assign greater weight to the findings of government experts than to the opposing opinions of defense experts. *United States v. Gastelum-Almeida*, 298 F.3d 1167, 1172 (9th Cir. 2002).

### B.    Analysis

The California Court of Appeal found that the trial court's definition of competency did not violate due process, and that there was substantial evidence for the trial court to find Petitioner was competent to stand trial:

14

Due Process

Appellant argues that due process "requires that the mental disorder requirement of section 1367 must be construed to require nothing more than a showing of any impairment which rendered appellant unable to consult with his lawyer with a reasonable degree of rational understanding."

Dr. Harper described the differences between a characterological disorder and a mental disorder. Dr. Echeandia said the categories "overlap" and considered appellant "beyond" having a characterological disorder.  As our state Supreme Court has recognized, "[M]ental health professionals do not necessarily agree on what constitutes mental illness." For forensic purposes, there will usually be an imperfect fit between the question of ultimate concern to the court and the information contained in a specific diagnosis. Even so, there is nothing to indicate that Dr. Harper's analysis and conclusion did not comport with the statutory and due process requirements. The precise category used by Dr. Harper in describing appellant is less important than the information about how and whether appellant's difficulties affected his ability to consult with counsel. Dr. Harper expressly found that appellant could rationally consult with his attorney. Although he did predict that appellant would choose to be an uncooperative client, this does not undermine the expert's conclusion for due process or statutory purposes, because the focus of both is on a defendant's present ability. Being predictably obstinate is not the equivalent of lacking the capacity to cooperate.

Dr. Harper explained, "Essentially characterological disorder is a condition in which [there] is a long term lifelong pattern of behavior, that is, the person uses in terms of their interaction between themselves and others a pattern of communication that is repetitive, use of defense mechanisms are repetitive in nature. The essential absence of a sense of internal feelings of guilt or sense of accountability with regard to behavior patterns. A resistance to adjustment or alterations in a particular pattern of behavior, of ways in which the person responds to stress. [] Basically a characterological disorder is an exaggeration of certain personality traits to the point of lack of flexibility and entrenchment and learning from experience and adjusting to behavior according to one's behavior."

Furthermore, whatever the limitations of Dr. Harper's testimony, there is nothing in the record to indicate the trial court employed an overly restrictive definition in reaching its conclusion that appellant was competent. Trial courts have been making competency findings long before psychologists and psychiatrists were testifying in such proceedings. Appellant has not shown that the trial court defined competency in a manner that did not comport with the requirements of due process.

Substantial Evidence

Appellant contends "the decision finding appellant competent is not supported by substantial evidence." Appellant argues, "Because Dr. Harper relied on an overly restrictive interpretation of the meaning of the term 'mental disorder,' his opinion does not provide any support for the decision of the trial court."

15

A finding of competence to stand trial cannot be disturbed if there is any substantial and credible evidence in the record to support the finding. Appellant argues that because Dr. Harper's conclusions were "flawed" they could not support the trial court's finding of competency. We disagree. The trial court need not base its finding that a defendant is competent on the conclusions reached by the expert witnesses, but rather does so based on the evidence presented.

The opinion of an expert is no better than the reasons upon which it is based.' [Citation.] And the chief value of such an expert's testimony ... lies 'in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant....'The value of the expert's testimony " ' "rests upon the material from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion; ... it does not lie in his mere expression of conclusion." (Italics added.) [Citation.] In short, "Expert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the facts and the validity of the reasons advanced for the conclusions."

The evidence presented at the hearing showed that appellant was considered somewhat paranoid because he believed his family wanted to have him put away. There was some disagreement over the degree of his paranoia, that is, whether his belief was irrational, and thus paranoid, because his family was not trying to have him put away, or rational, and thus not paranoid, because his family was in fact actively seeking to have him prosecuted or confined. Neither expert talked to appellant's family members. Both experts testified that appellant was distrustful of his appointed counsel and that he disagreed with counsel over how his case should be handled. However, Dr. Echeandia testified that despite this distrust, appellant was "not reluctant to provide information" "in his dealings with his lawyer."

The evidence from the appointed experts supports the trial court's finding of competence. Dr. Echeandia's conclusion that appellant lacked the capability of rationally cooperating with his attorney to present a defense was a "close call" and, for the most part, based on appellant's repeated tactical disputes with his appointed attorneys. Dr. Harper, a psychiatrist, had conducted 1,500 to 2,000 competency evaluations and Dr. Echeandia, a psychologist, had conducted far fewer. The trial court had the opportunity to observe and communicate with appellant during the two-day proceedings, which contributed to the determination of his competency. The evidence showed that appellant may have been difficult and suspicious, and disagreed with counsel's tactical choices about the conduct of his defense. However, he was willing to provide defense counsel with information about his current case. Despite having made the same complaints about his family "in a previous court case," appellant "was ultimately acquitted." Thus, the evidence supports the conclusion that appellant was capable of cooperating with counsel.

. . . The material presented through the reports and testimony of the experts in this case support the conclusion that appellant had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and was competent to stand trial.

16

(Resp. Ex. F at 14-18 (citations omitted).)

A state court's determination of competency to stand trial is entitled to a presumption of correctness in a federal habeas proceeding. *See Brewer v. Lewis*, 989 F.2d 1021, 1027 (9th Cir. 1993); *Torres v. Prunty*, 223 F.3d 1103, 1105 (9th Cir. 2000). Therefore, a federal court may overturn a state court competency finding only if it is not fairly supported by the record. *Brewer*, 989 F.2d at 1027.

Here, the Court of Appeal reasonably found that the competency determination was fairly supported by the evidence of Petitioner's present ability to consult with his attorney with a reasonable degree of rational understanding. Dr. Harper, a psychiatrist who had conducted 1,500 to 2,000 competency evaluations, concluded that Petitioner "did not have a mental disorder" but rather a "characterological disorder," and as a result, Petitioner could rationally consult with his attorney if he chose not to do so. RT 6-7, 13, 16, 19, April 23, 2002. Even Petitioner's expert, Dr. Echeandia, who had conducted far fewer competency evaluations, conceded that the question of Petitioner's competency was a "close call." RT 37-38, April 30, 2002. Echeandia also conceded that Petitioner understood the nature of the charges, understood the proceedings, and understood the role and function of the parties. RT 43. *See United States v. Hernandez*, 203 F.3d 614, 621 n.8 (9th Cir. 2000) (holding that standard for competence to stand trial requires nothing more than that a defendant having some minimal understanding of the proceedings against him).

Moreover, as noted by the Court of Appeal, the trial court had the opportunity to observe and communicate with appellant during the two-day proceedings. For example, when the court told Petitioner that he would be removed from court if he continued displaying obscenities, Petitioner agreed. RT 8-9, April 23, 2002. *See Godinez*, 57 F.3d at 695 (explaining that although no particular facts signal incompetence, suggestive evidence includes a defendant's demeanor before the trial court). Also, Petitioner was willing to provide defense counsel with

17

information about his case.  RT 162.  Dr. Harper explained that he predicted Petitioner would likely be an uncooperative defendant, however he also concluded that Petitioner had the mental capacity to make that choice rationally.  RT 15, April 23, 2002.  In sum, the Court of Appeal reasonably determined that there was enough evidence that Petitioner had a rational understanding of the proceedings against him such that he could, if he so chose, consult with his attorney in a rational manner.

Petitioner also argues that Dr. Harper used the term "mental disorder" in a "technical medical fashion," and drew an unwarranted distinction between a characterological disorder and a mental disorder.  According to Petitioner, this violated his right to due process because incompetency can be based on any mental condition that renders the defendant unable to assist counsel rationally in the conduct of a defense.  As the Court of Appeal correctly pointed out, however, the categories used by Dr. Harper are not as important as the evidence upon which he relied.  Dr. Harper's opinion of competency was based on the substantial evidence of Petitioner's ability to assist counsel rationally, as described above.  Dr. Harper drew the distinction between "characterological" versus "mental" disorders simply to explain why Petitioner *would* not, as opposed to *could* not, rationally assist counsel.

In light of the substantial evidence of competence upon which the trial court could reasonably rely in finding Petitioner competent to stand trial, the state courts' denial of Petitioner's claim was neither contrary to nor an unreasonable application of clearly established federal law.  Accordingly habeas relief is not warranted on this claim.

### III.   Ineffective Assistance of Counsel

Petitioner claims that he was deprived of effective assistance of counsel at his competency hearing because counsel did not object to Dr. Harper's testimony that Petitioner was competent to stand trial.  Petitioner further contends that during closing argument counsel improperly conceded that an assault had occurred.

18

### A.    Legal Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* The right to effective assistance of counsel applies to the performance of both retained and appointed counsel without distinction. *See Cuyler v. Sullivan*, 446 U.S. 335, 344-45, (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

### B.    Analysis

The Court of Appeal rejected Petitioner's claim that his counsel was ineffective because he failed to object to Dr. Harper's expert testimony, and improperly conceded an assault had occurred, as follows:

Dr. Harper's Testimony

Appellant contends he was deprived of the effective assistance of counsel at his competency hearing because his counsel failed to object to "the opinion of Dr. Harper that appellant was competent ... based on his erroneous interpretation of the meaning of the term 'mental disorder' under Penal Code section 1327 [sic]." Because we do not agree with appellant's argument that Dr. Harper's conclusion was constitutionally or statutorily flawed, we find counsel provided adequate representation.

19

Closing Argument

Appellant contends he received ineffective assistance of counsel because "although the evidence regarding whether an assault occurred was in substantial conflict, appellant's trial counsel unnecessarily conceded that an assault had occurred." Appellant was charged in count two with a felony violation of Penal Code section 245, subdivision (a)(1), assault with a deadly weapon. The trial court instructed the jury that as to this count it could find appellant guilty of the lesser included offense of a misdemeanor in violation of Penal Code section 240, simple assault.

At the beginning his closing argument, defense counsel focused the jury's attention on how the evidence in the case revealed what "the people were thinking ... what the intentions of the parties were." Defense counsel discussed the assault with a deadly weapon charge. He pointed out that "[w]e know absolutely nothing about the chain." Counsel began analyzing the elements of the assault with a deadly weapon charge, beginning with "was the person assaulted." Counsel said, "Whether you believe the chain was swung or whether you believe he reared his hand as described by Ms. Valdez, that will constitute an assault or an attempted assault. [] So then the next question is, was it committed with a deadly weapon or instrument? Well, that goes back to the chain again. Was it a deadly weapon or instrument?"

Addressing the most serious charge against appellant, the willful arson, defense counsel "agreed" with the prosecutor that there was no dispute that appellant's family home was "demolished because of [an] explosion" caused by the "buildup of propane in the home that was ignited." Counsel argued, "it's the words, it's the intentions that are really important." Counsel argued that the evidence showed that the fire was "unintentional" and "unintended ."

During rebuttal, the prosecution emphasized evidence showing appellant did swing the chain willfully and argued that appellant was "clearly" guilty of an assault and that the chain qualified as a deadly weapon. During deliberations, the jury asked, "Does the threat of raising your hand constitute [an] assault? Is assault more than a threat?" The jury acquitted appellant of assault with a deadly weapon and convicted him of the lesser-included offense of misdemeanor assault.

Appellant contends that the portion of the closing argument in which counsel stated, "Whether you believe the chain was swung or whether you believe he reared his hand as described by Ms. Valdez, that will constitute an assault or an attempted assault" amounted to ineffective assistance. Appellant argues, "the evidence was in conflict regarding whether appellant simply moved his hand back without any intent to swing the chain or whether he actually swung the chain toward Ms. Valdez." He argues that counsel's concession that an assault occurred withdrew a potentially meritorious defense, "namely, that appellant did not intend to swing the chain at Ms. Valdez when he brought it back and therefore no assault occurred."

It appears that neither the prosecutor nor the jury considered counsel's statement a particularly compelling concession, as the prosecutor did not

acknowledge the statement as such but rather continued to argue that the evidence showed the intent to assault, and the jury had a question about the charge.

"To establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.]" (People v. Samayoa (1997) 15 Cal.4th 795, 845.)

It is well established that defense counsel must not argue against his or her client in closing argument. (People v. Lucas (1995) 12 Cal.4th 415, 446.) However, counsel's admission of defendant's guilt in closing argument may not be ineffective based upon all the evidence presented at trial. (See People v. Bolin (1998) 18 Cal.4th 297, 334.) If overwhelming evidence of guilt exists, it may not necessarily be incompetent for an attorney to concede his or her client's guilt of a particular offense in situations where good trial tactics demand complete candor with the jury. " ' "[I]t is entirely understandable that trial counsel [would make] no sweeping declarations of his client's innocence but instead adopt[ ] a more realistic approach...." ' " (People v.. Lucas, supra, 12 Cal.4th at p. 447.) Additionally, [i]t is within a permissible range of tactics for defense counsel to candidly recognize the weaknesses in the defense in closing argument. [Citations.] (People v. Jones (1991) 53 Cal.3d 1115, 1150.) To prevail on a claim that counsel's concessions during closing argument constituted ineffective assistance, appellant must overcome the strong presumption that counsel's actions were sound trial strategy under the circumstances prevailing at trial. (People v. Bunyard (1988) 45 Cal.3d 1189, 1215.) Moreover, where evidence of the defendant's guilt is overwhelming, no prejudice is suffered. (People v. Avena (1996) 13 Cal.4th 394, 422-423.)

One element of the assault charge was that "a person willfully committed an act which by its nature would probably and directly result in the application of physical force on another person." One element of the arson charge was that "the fire was set or the burning was done willfully and maliciously." Defense counsel pointed out evidence that was consistent with a lesser-included offense of reckless arson, rather than willful arson, or with a conclusion that there was no criminal liability.

Counsel's theme in closing argument was what the evidence revealed about appellant's intent and how this family's conflicts gave rise to the charges against appellant. Counsel designed his argument to attack the willfulness element on the arson charge. Counsel had to know that a cool appraisal of the evidence on the assault charge would lead the jury to conclude that appellant had the requisite willfulness as to that count. Although Deeana did not actually see the chain swing at her, she testified to appellant's increasingly angrier demeanor and words, to his tennis-swing arm movement immediately before she ducked, and to seeing her nephew wrestling with appellant when she opened her eyes. By acknowledging that the evidence showed that appellant did intend to strike his sister with the chain, thus committing a misdemeanor assault, counsel could draw a comparison

to the evidence of willfulness in the arson charge, and use this demonstration of candor to strengthen his argument that the evidence showed that appellant did not intend to set off the explosion that was at the heart of the far more serious charge. That appellant was convicted of the arson count does not undermine that it was a reasonable tactical choice to argue the case as he did. Counsel did succeed in defeating the felony assault with a deadly weapon charge. Appellant has failed to meet his burden of establishing on the record before us that his trial counsel was ineffective.

(Resp. Ex. F at 18-22.)

Petitioner argues that he was deprived of effective assistance of counsel at his competency hearing because his counsel failed to object to Dr. Harper's opinion that Petitioner was competent to stand trial. The record shows that counsel took substantial steps to refute Dr. Harper's testimony, however. Counsel introduced his own expert, Dr. Echeandia, who testified that Petitioner was incompetent to stand trial and contradicted Dr. Harper's findings. RT 26, April 30, 2002. In addition, counsel vigorously cross-examined Dr. Harper. RT 7-24, April 23, 2002. Finally, the California Court of Appeal found the opinion of Dr. Harper to be proper under California Penal Code § 1367, a determination of state law that is binding on this court, *see Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); this court has also found, above, that the admission of his opinion was constitutional. As a result, any objection to the admission of Dr. Harper's opinion on statutory or constitutional grounds would have been meritless, would not have been properly granted, and  would not have led to a more favorable result  *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (trial counsel cannot have been ineffective for failing to raise a meritless motion).

Petitioner also complains that counsel conceded during closing argument that an assault occurred. However, while counsel did state in his closing argument, "whether you believe the chain was swung or whether you believe he reared his hand as described by Ms. Valdez, that will constitute an assault or an attempted assault," there is no evidence in the record to support Petitioner's assertion that such statement amounted to a concession of assault. RT 475, July 18, 2002. To the contrary, counsel's quoted statement is merely an accurate statement of the law,

that had Petitioner raised his hand or actually swung, he would in fact be guilty of attempted assault or assault.  However, shortly after making such statement, counsel argued that there was insufficient evidence that Petitioner had committed the assault.  RT 476.  Specifically, counsel argued that when Ms. Valdez ducked and closed her eyes, she did not hear the sound of the chain going by her or of the chain striking anything else.  *Id.*  Further, counsel argued that the chain had to be swung with sufficient force to produce death or great bodily harm, but there is no evidence that any force was used by Petitioner *Id.*  Lastly, the prosecutor did not argue during rebuttal that counsel had conceded assault, as she surely would have done if counsel had in fact conceded such a point.  Nor did the jury appear to believe counsel had made such a concession, as evidenced by their questions during deliberations as to what constituted assault.  As such, when viewed in context of counsel's entire closing argument and the rest of the trial record, counsel's remarks do not amount to a concession that Petitioner committed assault.

Moreover, even if the jury had interpreted counsel's remarks as somehow conceding assault, the state courts reasonably found that such a concession in the context did not constitute ineffective assistance.  As noted by the Court of Appeal, the evidence that Petitioner was trying to hit Ms. Valdez was strong: she credibly testified that Petitioner became increasingly angry and swung his arm back immediately before she closed her eyes, and that her nephew was wrestling Petitioner seconds later when she opened her eyes.  Where the evidence was strong, counsel's concession to Petitioner's attempted assault is a reasonable trial strategy for gaining credibility with the jury before challenging the much more serious arson charge. This is especially so in light of the fact that counsel was able to convince the jury to only convict Petitioner of a misdemeanor assault, instead of a felony.  Accordingly, there is no evidence that counsel's statement in his closing argument fell below an objective standard of reasonableness that resulted in ineffective assistance of counsel.

It is unnecessary for a federal court considering a habeas ineffective assistance of

counsel claim to address the prejudice prong of the *Strickland* test if Petitioner cannot even establish incompetence under the first prong. *See Siripongs v. Calderon,* 133 F.3d 732, 737 (9th Cir. 1998). Here, Petitioner has not shown his counsel's performance fell below an objective standard of reasonableness with respect to the testimony of Dr. Harper or during closing argument. Therefore, the state courts' denial of Petitioner's ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment for Respondent and close the file.

IT IS SO ORDERED.

DATED:  April 22, 2008

JEFFREY S. WHITE
United States District Judge

24

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

CUEN,

               Plaintiff,

  v.

EVANS et al,

               Defendant.

_____/

Case Number: CV05-04569 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on April 22, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Ullysses Paul Cuen
T72340
SVSP
P.O. Box 1050
Soledad, CA 93960-1050

Dated: April 22, 2008

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerkp